**[J-12A-2025 and J-12B-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 53 EAP 2024 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 1910 EDA |
| | : | 2022 entered on October 11, 2023, |
| v. | : | affirming the Order of the |
| | : | Philadelphia County Court of |
| | : | Common Pleas at No. MC-51-CR |
| JAMES SMITH, | : | 0006183-2021 entered on July 26, |
| | : | 2022. |
| Appellee | : | |
| | : | ARGUED: March 5, 2025 |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 54 EAP 2024 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 1911 EDA |
| | : | 2022 entered on October 11, 2023, |
| v. | : | affirming the Order of the |
| | : | Philadelphia County Court of |
| | : | Common Pleas at No. MC-51-CR- |
| PATRICK SMITH, | : | 0006184-2021 entered on July 26, |
| | : | 2022. |
| Appellee | : | |
| | : | ARGUED: March 5, 2025 |

**OPINION IN SUPPORT OF REVERSAL**

**JUSTICE WECHT**                                                **DECIDED: June 17, 2025**

Two off-duty police officers (one an Inspector, and one a Detective) chased a man

and threw him head-first into a concrete wall. The Commonwealth charged the two with

simple assault, criminal conspiracy, and recklessly endangering another person.[1] The

---

[1]      18 Pa.C.S. §§ 2701(a)(1), 903(a), and 2705, respectively.

Philadelphia Municipal Court dismissed all of the charges, and the Superior Court affirmed that dismissal. We granted review in order to decide whether the Municipal Court's ruling contravened our well-established principles governing preliminary hearings, and whether the Superior Court's decision upholding that ruling conflicted with our precedents. Because the lower courts substantively altered and misapplied the legal standards applicable to preliminary hearings, I would reverse the dismissal and remand this matter for trial.

Preliminary hearing testimony revealed the following. During the early morning hours of August 19, 2020, Paul McNally was walking near his Philadelphia home when two men, later identified as James Smith and Patrick Smith, pulled up next to him in a blue Mazda SUV.[2] Claiming to be members of a "Town Watch," the men told McNally that they had video footage of him trying to break into parked cars. McNally denied the allegation, and ran away in fear of the men.[3] Initially, the "town watchmen" trailed McNally in their car, but they eventually exited the vehicle and pursued him on foot. McNally called his mother as he ran.[4] The pursuers caught up to McNally, and "knocked [him] [in]to the wall,"[5] causing his head to bleed.

As he explained this to the court, McNally "touched the right side of his temple or his forehead above his right eye" to indicate where his injury had occurred.[6] McNally

---

[2]     Reproduced Record, ("R.R.") at 12a.

[3]     *Id.* at 13a.

[4]     *Id.*

[5]     *Id.*

[6]     R.R. at 13a.

recalled that the pursuers held him "to the ground as [he] was screaming."[7] The prosecutor asked McNally whether he had tripped and fallen into the wall.[8] McNally answered unequivocally: "No, I did not. They manhandled me and threw me to the wall."[9] McNally was treated at an urgent care facility for his injuries.

On cross-examination, Fortunato N. Perri, Jr., Esquire, counsel for the pursuer who had been identified as James Smith (an Inspector with the Philadelphia Police Department), accused McNally of attempting to break into unlocked cars.[10] When McNally denied the accusation, the following exchange ensued between counsel and the Municipal Court judge:

| | |
|---|---|
| Mr. Perri: | Your Honor, I ask this video be marked as D-1 for identification and I'd like to show it to the witness. |
| Court: | Is it relevant to today's proceedings? |
| Mr. Perri: | Yes. It's him trying car doors nine days before this incident. |
| Court: | On the evening in question? |
| Mr. Perri: | Nine days before the incident he's – |
| Court: | Well, it's irrelevant. |
| Mr. Perri: | Well, it's not. He said he never did it before. I got a video showing him doing it. |
| Court: | And I understand, but credibility is not an issue at this proceeding. |

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.* at 15a.

|  |  |
|---|---|
| Mr. Perri: | Okay. All right. All right. So we're charging guys with crimes regardless of what the evidence is. |
| Court: | Just proceed, Mr. Perri.[11] |

Attorney Perri concluded his cross-examination of McNally without playing the video. The Commonwealth then called Sergeant Zachary Koenig, an experienced member of the Philadelphia Police Department's Internal Affairs Division, who testified that Inspector James Smith was designated as "injured on duty," or "IOD," at the time that the incident occurred.[12] On cross-examination, Attorney Perri asked Sergeant Koenig to read into the record the "Off-Duty Action Report" (the "Report") prepared by the Smiths' supervisors in the wake of the incident. The Report stated:

> [o]n 8/19/20 at approximately 12:30 a.m. Detective Smith, Badge Number 641, assigned to Major Crimes FBI Task Force, along with Inspector James Smith, while off duty in the area of Knights and Fairdale Road, heard a person screaming. They observed a male looking into a vehicle and attempting the doors on both sides. [The Smiths] had prior knowledge of auto thefts and theft from autos in the immediate area.
>
> [The Smiths] followed the male and attempted to identify themselves, at which time the male ran and tripped. The male was stopped at the rear of the store at Knights and Fairdale Road.
>
> [The Smiths] called 911 and uniformed officers arrived on location. The male was investigated for ped. inves.[13] at this time. The investigation continues into the auto thefts and thefts from autos in the area.[14]

---

[11]    *Id.*

[12]    R.R. at 17a.

[13]    *Id.* Attorney Perri clarified for the record that "ped. inves." indicates that a uniformed officer arrived and conducted a pedestrian stop. *See id.* at 17a-18a.

[14]    *Id.* at 17a.

At the conclusion of Sergeant Koenig's testimony, the court reversed course, asking Attorney Perri if he wanted "to recall [McNally] in regards to the video that [Attorney Perri had]?"[15]  Without further explanation, the court allowed the video—which the court previously had deemed irrelevant and, thus, inadmissible.[16]  Attorney Perri used the video again to accuse McNally of attempting to break into cars nine days earlier.  McNally again denied the allegation, and insisted that he was not the person shown in the video.[17]

During closing arguments, Attorney Perri accused McNally of lying.  Attorney Perri told the court: "You saw this video.  It's [McNally].  He's on Patrician Drive nine days before being confronted by a neighbor because he opened the car door on that one, on the video you saw."[18]  In response, the Commonwealth emphasized that McNally testified that he had not tried to open any car doors, that the Smiths approached and chased him, and that they "slammed him into a wall and then took him to the ground."[19]  The Commonwealth stressed that Inspector James Smith was on IOD status, meaning that he knew that "he should not have been taking any police action," and that McNally himself was "never arrested" or even "investigated any further" for the alleged car thefts.[20]

The Commonwealth's arguments notwithstanding, the court dismissed all of the charges against both of the Smiths.  The court explained that:

---

[15]     *Id.* at 19a.

[16]     *See id.* at 15a (stating "credibility [was] not an issue at this proceeding.").

[17]     R.R. at 19a.

[18]     *Id.* at 20a.

[19]     *Id.* at 21a.

[20]     *Id.*

... when [McNally] fled, you know, police are going to follow somebody when they flee. Just basic police actions. I don't see criminal culpability here at all. At best you have is [*sic*] somebody not following police directives because they were IOD and they never should have reacted to this. But I don't find any criminal culpability whatsoever. This matter is discharged for lack of evidence.[21]

The Commonwealth re-filed the charges pursuant to Pa.R.Crim.P. 544, which provides that, "[w]hen charges are dismissed [at] a preliminary hearing . . . the Commonwealth may reinstitute the charges by approving, in writing, the re-filing of a complaint with the issuing authority who dismissed . . . the charges."[22] At the ensuing hearing before the Court of Common Pleas, the Commonwealth did not present any new evidence. Instead, the Commonwealth relied exclusively upon the evidence presented at the preliminary hearing. The Commonwealth argued that the initial court evaluated that evidence using a higher standard than is required at a preliminary hearing. Citing *Commonwealth v. Perez*,[23] the Commonwealth argued that the Municipal Court impermissibly made credibility determinations.[24]

The Court of Common Pleas agreed with the lower court that the Commonwealth had failed to establish a *prima facie* case, and it dismissed the re-filed charges. The Commonwealth appealed.

---

[21] *Id.* at 22a.

[22] Pa.R.Crim.P. 544(A).

[23] 249 A.3d 1092, 1102 (Pa. 2021) (explaining that weight and credibility of the evidence are not factors at a preliminary hearing).

[24] R.R. at 31a.

The Superior Court affirmed.[25] The appellate panel ruled that the Commonwealth had failed to establish a *prima facie* case for the requisite *mens rea* for simple assault. A person commits simple assault when he "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another[.]"[26] Bodily injury is defined in the Crimes Code as "[i]mpairment of physical condition or substantial pain."[27] Even if the victim does not actually sustain bodily injury, a person may commit simple assault if he acts with "a specific intent to cause bodily injury[.]"[28]

The Commonwealth argued that, for purposes of a preliminary hearing, McNally's testimony—that the Smiths manhandled him and threw him into a wall—was sufficient to establish the Smiths' intent to harm him.[29] The Commonwealth maintained that the lower courts instead credited the Smiths' purported belief that McNally was committing a crime over McNally's testimony, an impermissible exercise at a preliminary hearing. The Commonwealth also asserted that the question of whether the Smiths credibly believed that McNally was attempting to break into cars was one for a jury, not one for a preliminary hearing.[30]

The panel disagreed, reasoning that McNally's own testimony could not support a reasonable inference that the Smiths intended to harm him. According to the panel,

---

[25] *Commonwealth v. Smith*, 305 A.3d 1, 4 (Pa. Super. 2023).

[26] 18 Pa.C.S. § 2701(a)(1).

[27] 18 Pa.C.S. § 2301.

[28] *Commonwealth v. Richardson*, 636 A.2d 1195, 1196 (Pa. Super. 1994).

[29] *Smith,* 305 A.3d at 9.

[30] *Id.*

McNally knew that the Smiths intended to detain him, not to injure him. The Smiths detained McNally, called 911, and waited for uniformed officers to arrive on the scene. As such, according to the panel, it would have been unreasonable to infer that the Smiths intended to harm McNally. Therefore, the Commonwealth failed to establish the requisite *mens rea* for simple assault.[31]

Similarly, the panel held that the Commonwealth could not prove that the Smiths acted recklessly or knowingly for purposes of simple assault. In the panel's view, McNally's testimony demonstrated that the Smiths slammed him into the wall not to injure him, but instead to stop him from fleeing. To reach this conclusion, the panel necessarily credited the assertion that the Smiths intended to detain McNally, not to harm him.[32]

Next, the panel opined that the Commonwealth also failed to establish the elements of criminal conspiracy. A person is guilty of criminal conspiracy if he: "(1) entered into an agreement to commit . . . an unlawful act with another person . . . , (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy."[33] The Commonwealth argued that McNally's testimony—that the Smiths together confronted him, chased him, slammed him into a wall, and held him down until uniformed officers arrived—was sufficient to establish a *prima facie* case for criminal conspiracy. The Commonwealth contended that, although no express agreement was stated between the Smiths, an agreement to assault McNally nonetheless existed

---

[31]    *Id.* at 10-11.

[32]    *Id.* at 11.

[33]    *Commonwealth v. Fisher*, 80 A.3d 1186, 1190-91 (Pa. 2013) (citation omitted); *see* 18 Pa.C.S. § 903(a)(1), (e).

between them, which agreement arose from their relationship as brothers and their identical conduct of waiting to call 911 and failing to identify themselves as police.[34] However, the panel discerned no evidence, direct or circumstantial, that would have supported a reasonable inference that the Smiths acted with a shared criminal intent.[35] The panel reiterated that the *only* reasonable inference that could be drawn from the evidence in this case was that the Smiths intended to stop McNally from fleeing the area.

Finally, the panel concluded that the Commonwealth failed to establish evidence that the Smiths recklessly endangered another person. A person is guilty of recklessly endangering another person ("REAP") "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury."[36] The Commonwealth argued that McNally's testimony demonstrated that the Smiths chased McNally and together used their momentum to slam his head into the wall.[37] Given that the head is a vital part of the body, the Commonwealth argued, it was a matter of common-sense to infer that the Smiths acted recklessly with regard to a substantial and unjustified risk of seriously injuring McNally.[38] The Superior Court rejected this argument.

---

[34] *Smith*, 305 A.3d at 9.

[35] *Id.* at 12.

[36] 18 Pa.C.S. § 2705; *see* 18 Pa.C.S. § 2301 (defining "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ").

[37] *Smith*, 305 A.3d at 9.

[38] *Id.* at 9-10.

The panel ruled that "[t]here was simply no evidence" to support a reasonable inference that the Smiths' conduct placed McNally "'in danger of death or serious bodily injury.'"[39]

We granted review in order to resolve the question of whether "the Superior Court [violated] this Court's controlling legal standard by holding that the evidence was insufficient to establish a *prima facie* case" that the Smiths committed simple assault, criminal conspiracy, and recklessly endangering another person.[40] Because the lower courts made credibility determinations, in violation of the standards that govern the conduct of preliminary hearings, I would answer this question in the affirmative and would reverse the Superior Court. I would remand this matter for trial.

The preliminary hearing is not a mere formality in the criminal process. Although not constitutionally required, the hearing serves vital interests in maintaining the delicate balance between the Commonwealth's obligation to prosecute crimes and the defendant's constitutional liberty interests.[41] For the Magisterial District Judge or Municipal Court Judge, the hearing is an opportunity to "fulfill their essential role of determining whether the Commonwealth has presented enough evidence to detain the

---

[39] *Id.* at 12 (quoting 18 Pa.C.S. § 2705).

[40] The question, as presented by the Commonwealth, states:

Did the Superior Court override this Court's controlling legal standard by holding that the evidence was insufficient to establish a *prima facie* case that defendant[s], [ ] off-duty police officer[s], committed simple assault, criminal conspiracy, and reckless endangerment, where the co-defendants . . . .accused a [pedestrian] of breaking into cars, chased him as he ran for help, and slammed him into a pillar−injuring his head, arms, and legs?

*Commonwealth v. Smith*, 322 A.3d 1290 (Pa. 2024) (*per curiam*).

[41] *Commonwealth v. McClelland*, 233 A.3d 717, 737-38 (Pa. 2020) (Wecht, J., concurring).

accused."[42]  For the Commonwealth, a preliminary hearing is often "the prosecutor's entry point into the process, and provides the prosecutor with the first substantive view of the evidence that police uncovered before charging the defendant."[43]  The Commonwealth's ability to gauge the strength of its case serves judicial efficiency by "prompting the Commonwealth to utilize its resources to prosecute only the charges that are reasonably capable of being proven at trial."[44]

For the defendant, the hearing affords the chance to gain a fair assessment of the strength of the case he faces.  The defendant is provided a limited opportunity to test the Commonwealth's case, to direct his pretrial investigation, to exercise his constitutional right to an attorney in a meaningful fashion, and to consider intelligently whether to plead guilty or proceed to trial.[45]  It is also the first event at which the defendant's right to counsel attaches.[46]

At the preliminary hearing, the Commonwealth's initial burden is not particularly onerous or demanding.  To the contrary, the "Commonwealth's evidentiary burden is a relatively light one."[47]  The Commonwealth must only establish a *prima facie* case, which requires the Commonwealth to come forward with some evidence as to each of the

---

[42]     *See Commonwealth v. Ricker*, 170 A.3d 494, 509 (Pa. 2017) (Wecht, J., dissenting).

[43]     *Commonwealth v. Harris*, 315 A.3d 26, 42 (Pa. 2024) (Wecht, J., concurring).

[44]     *Id.*

[45]     *Ricker*, 170 A.3d at 509 (Wecht, J., dissenting)

[46]      *Id.* (citing *Coleman v. Alabama*, 399 U.S. 1, 9-10 (1970) (plurality)).

[47]     *McClelland*, 233 A.3d at 737 (Wecht, J., concurring).

elements of the crimes charged as well as some evidence that the accused is probably the individual who committed the offense.[48]

The presiding jurist is not to decide the guilt or innocence of the accused.[49] The court must consider the proffered evidence in the light most favorable to the Commonwealth and must draw all reasonable inferences from that evidence in the Commonwealth's favor.[50] Of particular relevance here, the credibility of the Commonwealth's witnesses is irrelevant.[51] The judge must take the Commonwealth's evidence as true.[52] The question in this case is whether the lower courts turned a blind eye to this legal standard.

The question of the "evidentiary sufficiency of the Commonwealth's *prima facie* case is one of law."[53] As such, this Court's standard of review is *de novo,* and our scope of review is plenary.[54]

In *Perez,* we reminded the bench and bar that "[t]he weight and credibility of the evidence are not factors at the preliminary hearing stage."[55] Here, at first, the Philadelphia Municipal Court Judge heeded this standard. The court prohibited Attorney Perri from challenging McNally's credibility. By initially preventing counsel from using the

---

[48]    *Perez*, 249 A.3d at 1102-03.

[49]    *Id.*

[50]    *Id.* at 1102.

[51]    *Id.*

[52]    *Id.*

[53]    *Id.* (internal quotation marks omitted).

[54]    *Id.* (citing *McClelland*, 233 A.3d at 732).

[55]    *Perez*, 249 A.3d at 1102.

video, the court correctly acknowledged that "credibility is not an issue at this proceeding."[56] In an about-face, the court subsequently allowed the video, with no on-the-record justification for doing so. The court understood that the purpose of the video was to impeach McNally's credibility. Admitting the video as relevant evidence at the preliminary hearing was error. By admitting the video, the court opened the door to the Smiths' closing argument, in which Attorney Perri referenced the video to, once again, impeach McNally's credibility.

The lower court then credited the Smiths' version of events—which amounted to an affirmative defense—disregarding our instruction in *Perez* that it could do no such thing. Indeed, defense counsel stated that the video was relevant because "[McNally] said he never [tried to open car doors] before. [Attorney Perri had] a video showing him doing it."[57] The court concluded that:

> [E]ven if [the judge] couldn't see that it was [McNally] in that video, what it does show is that there is that type of criminal activity going on in that neighborhood. So it certainly bolsters the [Smiths'] mental state that they were knowledgeable about the fact that there were car thefts in the area. And it was a legitimate reason to inquire of the individual.[58]

The judge stated that he thought the video "bolster[ed]" the Smiths' "mental state."[59] In other words, faced with two versions of events, the court chose to believe the one presented by the defense over the one presented by the Commonwealth. The only way to achieve this result is to weigh the credibility of the witnesses and to elevate one

---

[56] R.R. at 15a.

[57] *Id.*

[58] R.R. at 22a.

[59] *Id.*

over the other. This is impermissible at the preliminary hearing stage. As *Perez* requires, if McNally's testimony alone establishes all of the elements of a *prima facie* case, a court is not permitted to disregard that testimony, no matter the defense or justification offered by those charged.

The Superior Court's analysis suffers from the same shortcoming. It is reasonable to infer that two men who knock or throw another into a wall intend to harm him, no matter their reason for doing so. This is especially so after the two men chase their victim in a car and then on foot. The off-duty Smiths engaged in a pursuit without seeking back-up and without alerting law enforcement to the pursuit until after they had harmed McNally. The lower courts were bound to infer an intent to harm when viewing the testimony in the light most favorable to the Commonwealth. Neither did so. Instead, the courts concluded that the Smiths merely intended to detain McNally. This inference favored the defense, premised upon impermissible credibility determinations and disregard of the governing law.

By presuming that the Smiths attempted to identify themselves as law enforcement officers, the lower courts also construed the facts in the light most favorable to the Smiths, not the Commonwealth, as the law requires. McNally testified that the Smiths identified themselves as a part of a "Town Watch," which was not true.[60] The Report authored by the Smiths' supervisors asserted that the Smiths "attempted to identify themselves."[61] These two accounts contradict one another. Our clear mandate for preliminary hearings—that "the evidence must be read in the light most favorable to the

---

[60]    *Id.* at 16a.

[61]    *Id.* at 17a.

Commonwealth's case"—required the lower courts to accept the Commonwealth's evidence on this point, not the defendants'.[62]  For its part, the Superior Court opined that, when the Smiths approached McNally, "instead of engaging in further conversation, McNally ran."[63]  The suggestion that McNally should have stayed and engaged in further conversation credits the defense assertion that alleged that the Smiths "attempted" to identify themselves as law enforcement officers.  It would be unreasonable to assume that a citizen would stay and engage in further conversation with strangers who approached him in a car after midnight, claiming to be a part of some "Town Watch."  Had the lower courts viewed the facts in the light most favorable to the Commonwealth, as required, their examination of the *mens rea* elements of the crimes charged would have accounted for the fact that the Smiths failed to identify themselves correctly.

The Superior Court made a similar mistake in reviewing the REAP charge.  The Superior Court failed to view the evidence in the Commonwealth's favor, and cherry-picked inapposite language from the transcript to imply that McNally was to blame.  The Superior Court created an artificial distinction between "knocking" and "ramming" another person's head into a wall for purposes of reckless endangerment.  A person is guilty of recklessly endangering another person "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury."[64]  In its one paragraph consideration of the REAP charge, the Superior Court resolved the matter on unpersuasive linguistic grounds:

---

[62]     *Perez*, 249 A.3d at 1102.

[63]     *Smith*, 305 A.3d at 11.

[64]     18 Pa.C.S. § 2705.

There was simply no evidence presented to support a reasonable inference that [the Smiths] engaged in conduct that placed McNally "in danger of death or serious bodily injury." *See* 18 Pa.C.S. § 2705. Although the Commonwealth emphasizes that repeated blows to a person's head can support an inference that the actor "inten[ded] to inflict serious bodily injury[,]" that was not what occurred in the present case. . . . Nor, as the Commonwealth suggests, did McNally state that [the Smiths] "used [their] momentum" from the chase to "ram his head into a wall." . . . **Instead, McNally testified that the men "knocked" or "threw" him into the wall, where he "slammed the side of [his] head."** N.T., 2/22/22, at 11-12. There is simply no testimony to support an inference that [the Smiths] repeatedly hit McNally in the head, or purposely smashed McNally's head into the wall.[65]

The panel acknowledged that McNally testified that, "[t]hey manhandled me and threw me to the wall."[66] The panel further acknowledged that McNally testified that the Smiths, "knocked [him] to the wall."[67] And yet the panel suggested that there was some factual distinction between two men "purposely smash[ing]" someone's head into a wall and what took place here.[68] The panel reframed the testimony to imply that McNally testified that he slammed his own head into the wall, after tripping or falling on his own.

The panel's justification for finding that McNally was not put at risk of serious bodily injury was the purported absence of evidence that the Smiths "repeatedly" hit him in the head, or "purposely smashed" his head into the wall.[69] The panel elevated the contents

---

[65] *Smith*, 305 A.3d at 12 (emphasis added, some citations omitted).

[66] *Id.* at 4 (citing R.R. at 13a).

[67] *Id.* (citing R.R. at 13a).

[68] *Id.* at 12.

[69] *Id.*

of the Report, which claimed that McNally tripped, over McNally's own testimony that he "did not [trip]. They manhandled me and threw me to the wall."[70]

Regardless, the panel made no attempt to explain how throwing or slamming someone into a wall puts them at less risk for bodily injury than smashing someone into a wall. To distinguish between smashing someone's head into a wall and throwing someone into a wall, whereupon the person slams his head, is to impermissibly frame the facts of this case in the light most favorable to the Smiths.[71]

The lower courts deviated from the standards governing preliminary hearings. Today's affirmance by operation of law will have significant, far-reaching consequences. Prosecutors' burdens at preliminary hearings have now been made more difficult. The Superior Court's decision rewrites the law of such hearings.

Defendants will feel free to present evidence at preliminary hearings that would tend to impeach the credibility of the victims of crimes, whereas such evidence was inadmissible and irrelevant until today. Judges now will draw inferences for the defendant, even if such inferences are not supported by the facts presented by the Commonwealth. Those judges no longer will feel bound to view the facts in the light most favorable to the Commonwealth, so long as the defendant can produce some contrary facts that the judge finds more credible. The lower courts in this case flipped our preliminary hearing standard on its head. By sitting silent, this Court allows that paradigmatic shift to creep into, and to take over, the law of preliminary hearings. This Court's error perpetuates, and indeed magnifies, the lower court's missteps.

---

[70]    R.R. at 13a.

[71]    *Perez*, 249 A.3d at 1102.

This is bad news for prosecutors and law enforcement officers (other than the two charged as defendants here). Preliminary hearings will transform into mini-trials. This, in turn, will require prosecutors and law enforcement officers to find and present more evidence than they otherwise are required to do.

The prosecutor here presented more than enough evidence, when viewed as our law requires, to present these charges to a jury. The Superior Court's approach in this case will be detrimental to law enforcement and prosecutors throughout Pennsylvania. Police officers may hesitate to file simple assault charges. It may be too difficult to prove a *prima facie* case when the defense can impugn the credibility of the injured victim. In light of the incongruent application of current Pennsylvania law and the troubling effect that this new standard likely will produce, we should reverse the Superior Court's order and remand this matter for trial.

Chief Justice Todd and Justice Donohue join this opinion in support of reversal.